Filed 12/27/21

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| STEVEN A. SUGARMAN et al., | B307753 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. 19STCV36697) |
| v. | |
| HALLE BENETT et al., | |
| Defendants and Appellants. | |

APPEALS from orders of the Superior Court of Los Angeles County, Gregory Wilson Alarcon, Judge. Affirmed in part and reversed in part.

Anderson Kill and Cozen O'Connor, Jeremy E. Deutsch, Christian V. Cangiano, Erik L. Jackson; Anderson Kill California and Bridget B. Hirsch for Plaintiffs and Appellants.

Morrison & Foerster, Mark R. McDonald, James R. Sigel, Joseph R. Palmore and Michael F. Qian for Defendants and

---

\*     Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts 2 through 7 of the Discussion.

Appellants Halle Benett, Hugh Boyle, John Grosvenor, Jeffrey Karish, Richard Lashley, Jonah Schnel, and Robert Sznewajs.

Simpson Thacher & Bartlett, Chet A. Kronenberg, Jonathan Sanders; Scheper Kim & Harris, David C. Scheper, Gregory A. Ellis, Michael L. LaVetter and Alexandra C. Aurisch for Defendants and Appellants Banc of California, N.A. and Banc of California, Inc.

_____

## SUMMARY

These are appeals by both plaintiffs and defendants from trial court rulings on two anti-SLAPP (strategic lawsuits against public participation) motions to strike seven of the 12 causes of action in plaintiffs' complaint. (Code Civ. Proc., § 425.16; further statutory references are to this section unless otherwise specified.)

Plaintiff Steven A. Sugarman and his trust sued Banc of California, several individual directors and Banc executives, and Banc's lead auditor, in the wake of a scandal that led to plaintiff's resignation from his positions at Banc in January 2017. Banc brought its own anti-SLAPP motion, and seven of the present or former directors or executives (the Banc individuals) brought a separate anti-SLAPP motion. The rulings on those two motions are the subject of this appeal. Two other individual defendants brought their own separate anti-SLAPP motions, and their appeals are resolved in a separate opinion. (*Sugarman v. Brown* (Dec. 27, 2021, B308318).)

The trial court granted in part and denied in part the two motions to strike that are the subject of this appeal. We conclude the trial court should have granted both motions in their entirety, and so affirm the orders in part and reverse them in part. We

publish the portion of our opinion holding that statements Banc made in its Forms 8-K and 10-Q filed with the Securities and Exchange Commission (SEC), as well as related investor presentations and conversations, are protected activity under section 425.16, subdivision (e)(2) as matters under review and consideration by the SEC. Statements related to financial projections were also protected under section 425.16, subdivision (e)(4), as matters of public interest.

## FACTS

### 1. The Parties

Plaintiff is the former chairman of the board, president and chief executive officer (CEO) of defendants Banc of California, Inc., and Banc of California, N.A. (Banc). He resigned his positions at Banc on January 23, 2017. The Steven and Ainslie Sugarman Living Trust, a revocable living trust and stockholder in Banc, is also a plaintiff. For convenience, we refer to both Mr. Sugarman and the trust in the singular as plaintiff.

Plaintiff sued Banc and the Banc individuals over statements they made after plaintiff's resignation. The Banc individual defendants were executives or members of the board of directors and include Halle Benett, Hugh Boyle, John Grosvenor, Jeffrey Karish, Richard Lashley, Jonah Schnel and Robert Sznewajs. When plaintiff resigned, Mr. Sznewajs became chairman of the board. Mr. Boyle was Banc's chief risk officer and became interim CEO as well when plaintiff resigned. Mr. Grosvenor was general counsel and corporate secretary.

### 2. The Complaint

The operative complaint spans 166 pages, plus more than 600 pages of attached exhibits. Plaintiff alleged 12 causes of action. The seven causes of action at issue in these appeals fall

3

into four categories: (1) fraudulent inducement and negligent misrepresentation to induce holder to hold securities (the inducement claims); (2) preventing subsequent employment by misrepresentation (blacklisting) and tortious interference with prospective economic advantage; (3) unfair competition and conspiracy to engage in unfair competition (the UCL claims); and (4) defamation.

The complaint alleges that plaintiff reported wrongdoing and self-dealing by defendant Halle Benett and others at Banc, and then he resigned, after the director defendants refused to address the wrongdoing (described at length in the complaint). A separation agreement provided severance payments in exchange for mutual releases of all potential claims that existed as of January 23, 2017. Defendants immediately launched a campaign to attack plaintiff in order to conceal their wrongdoing, dissuade him from selling his Bank stock, and harm his ability to compete with defendants.

In addition to concealing "numerous illegal acts" and breaching various contracts, defendants "also have hidden from [plaintiff] the true state of Banc's business including its cratering financial performance since his departure," and took various actions "to obscure the devastating effects their illegal actions had on Banc's business, financial performance and prospects. Defendants made their false representations in order to harm [plaintiff] including in order to induce [plaintiff] to hold his Banc securities in reliance on the false information, promises, and disclosures." The complaint alleges defendants "have conducted a coordinated campaign . . . to further their Cover Up, to damage [plaintiff's] reputation with a barrage of vindictive, untrue, and harmful actions; to publish and distribute false and misleading

4

information intended to present [plaintiff] in a negative light; and to scapegoat [plaintiff] for their wrong-doing and [m]isconduct which has resulted in tens of millions of dollars of damages to [plaintiff]."

We will describe the allegations in more detail in our legal discussion.

## 3. Background Facts

As might be expected, plaintiff and defendants paint a very different picture of the circumstances surrounding plaintiff's resignation and the aftermath. Some background facts are not open to dispute.

Plaintiff is a prominent businessman and entrepreneur in California and headed Banc from 2013 until January 2017.

On October 18, 2016, an anonymous blogger made allegations of wrongdoing against Banc and senior officers and directors at Banc, claiming they had extensive ties to notorious fraudster Jason Galanis, who was known for secretly gaining control of financial institutions and other public companies and looting their assets. The blog post concluded Banc was "simply un-investible." Plaintiff was prominent among the officers and directors named in the blog post.

That same day, Banc published a press release announcing it was aware of the allegations posted; the board, acting through its disinterested directors, had previously begun a thorough independent investigation of claims of an affiliation between Galanis and company personnel; the board had received regular reports over the last year from the law firm leading the investigation; and certain claims of affiliations made by Galanis concerning a company in which plaintiff had an interest were fraudulent.

5

Three months later, on January 23, 2017, Banc issued two more press releases. One announced a new chairman of the board (defendant Sznewajs) and plaintiff's resignation. The other provided an update on the independent investigation into the blog post allegations. It stated that, in response to the allegations in the blog post, the board formed a special committee that began a process to review the allegations. On October 27, 2016, Banc's independent auditor, KPMG, sent a letter "raising concerns about allegations of 'inappropriate relationships with third parties' and 'potential undisclosed related party transactions.'" On October 30, 2016, the special committee hired a law firm with no prior relationship with Banc to conduct an independent investigation of the issues raised by the blog post and questions raised by the KPMG letter.

The press release further stated the inquiry had determined that Banc's initial October 18, 2016 press release contained inaccurate statements. While an investigation had been conducted before the blog post appeared, "it appears to have been directed by Company management rather than any subset of independent directors," and the press release did not disclose that the law firm conducting the investigation had previously represented both Banc and plaintiff individually. (A declaration from a lawyer for the Banc individuals states that plaintiff ordered the October 18 press release to be published; plaintiff's declaration states others at Banc drafted and disseminated the release.)

The press release reported that on January 12, 2017, the SEC "issued a formal order of investigation directed at certain of the issues that the Special Committee is reviewing," and subpoenaed documents from Banc, "primarily relating to the October 18, 2016 press release and associated public statements."

6

The January 23, 2017 press release also announced changes in corporate governance policies, including separating the roles of board chair and CEO, and indicated Banc was "in the process of preparing a more rigorous policy to govern review and approval of proposed related party transactions."

Also on January 23, 2017, the first of several class action complaints was filed, alleging violation of federal securities laws, naming Banc, plaintiff, and two other defendants. The complaint described the blog post and ensuing events, and alleged false or misleading communications to investors and failures to disclose material information relating to the blog post investigation.

On February 9, 2017, the law firm conducting the independent investigation for the special committee reported that its inquiry found no evidence Jason Galanis had any control or undue influence over Banc.

More than two and a half years later, on September 15, 2019, the lead plaintiff in the securities litigation agreed to dismiss Mr. Sugarman with prejudice. The agreement states the class action plaintiff found no proof Galanis had any control over Mr. Sugarman or affected his actions, and the October 18, 2016 press release reflected information provided to Mr. Sugarman. The agreement provided the dismissal with prejudice was to become effective upon approval of the agreement as well as a settlement with Banc.

A month later, plaintiff filed the complaint in this case. Several weeks after that, plaintiff was voluntarily dismissed, without prejudice, from Banc stockholder derivative litigation.

On December 20, 2019, the SEC concluded its investigation of plaintiff, with no action being taken.

7

## 4.     The Anti-SLAPP Motions and Rulings

Banc and the Banc individuals filed separate anti-SLAPP motions, and Banc joined in the Banc individuals' motion.

In response, plaintiff submitted an 80-page declaration, along with several other declarations.  The Banc individuals filed 281 objections, and Banc filed more than 200 objections, many of which were sustained.

The trial court granted Banc's motion in part, but only with respect to certain allegations of the inducement, UCL and defamation claims.  The court found Banc did not show that all statements about plaintiff's departure from Banc relevant to the tortious interference claim arose from protected activity.  The court did not strike any cause of action in its entirety.

Similarly, the trial court granted the Banc individuals' motion only in part, striking some but not all allegations in the inducement, tortious interference and defamation causes of action, refusing to strike the UCL claim, and striking the UCL conspiracy claim.

All parties contend in various respects that the trial court ruled inconsistently and erroneously failed to consider certain arguments.  Because our review is de novo, we need not consider or describe further the trial court's rulings.

All parties filed timely notices of appeal.

## DISCUSSION

The anti-SLAPP statute and procedures have been described many times.

A defendant may bring a special motion to strike any cause of action "arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a

public issue . . . ." (§ 425.16, subd. (b)(1).)  When ruling on an anti-SLAPP motion, the trial court employs a two-step process.  The moving defendant bears the initial burden of establishing that the challenged allegations or claims " ' "aris[e] from" protected activity in which the defendant has engaged.  [Citations.]  If the defendant carries its burden, the plaintiff must then demonstrate its claims have at least "minimal merit." ' [Citation.]  If the plaintiff fails to meet that burden, the court will strike the claim." (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 884.)

In making these determinations, the trial court considers "the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (§ 425.16, subd. (b)(2).)  "As to the second step, a plaintiff seeking to demonstrate the merit of the claim 'may not rely solely on its complaint, even if verified; instead, its proof must be made upon competent admissible evidence.' " (*Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 788.)

Our review is de novo.  (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3.)

1. **The Inducement Claims:  Protected Activity**
   a. **The allegations and evidence**

The fraudulent and negligent inducement claims were based on the same facts, alleging the Banc defendants made misrepresentations to induce plaintiff to hold, rather than sell, Banc common stock and warrants.

The complaint alleged Banc made misrepresentations in investor presentations and in public disclosures in Forms 8-K and 10-Q filed with the SEC.  "The SEC requires disclosure of specified material changes and other events 'that the registrant deems of importance to security holders' whenever they occur via a Form 8-

9

K." (*Hawran v. Hixson* (2012) 209 Cal.App.4th 256, 263, fn. 2 (*Hawran*).) A Form 10-Q is a quarterly report of financial performance that publicly traded companies must file with the SEC.

For example, on January 30, 2017, defendants hosted an investor conference call. Defendant Boyle "provided very optimistic guidance to investors given the enormous changes at the Banc. [Defendants] indicated the Banc would make $2.00 per share and achieve very attractive financial returns across multiple metrics. They indicated [plaintiff's] departure would not result in material earnings disruption and would have an immaterial impact on lending, deposits and earnings." Plaintiff's complaint cites and attaches Banc's Form 8-K's filed with the SEC, which attach the investor presentation materials containing the earnings per share guidance.

As another example, Banc's 10-Q report for the quarter ending March 31, 2017, stated that Banc "will further enhance our risk assessment and monitoring activities by implementing new training activities, hiring additional capable resources, improving our certification and sub-certification quarterly processes, and enhancing our Risk and Fraud Risk assessment processes to ensure appropriate resources and controls are in place to mitigate risks commensurate with the risk assessment."

Defendants' misrepresentations included "that [defendants] would conduct sufficient and detailed investigations, free from conflict, concerning the allegations raised by all of the various whistleblower complaints." This included representations made by defendant Lashley in a telephone call with plaintiff on April 6, 2017.

Plaintiff alleged that in the telephone call with Mr. Lashley, he pointed out certain disclosures in a March 6, 2017 investor presentation he believed to be false. He asked Mr. Lashley to "conduct a full review of the disclosures and ensure all misstatements were corrected." These included plaintiff's concerns about whether Banc would be able to achieve its $2 earnings-per-share guidance, and "numerous concerns relating to malfeasance and potentially false and misleading disclosures at Banc." Defendant Lashley told plaintiff he would personally ensure Banc's financials and public disclosures were reliable and accurate.

According to plaintiff, in the telephone call, Lashley also told plaintiff that "he hoped [plaintiff] would continue to be a large shareholder" and said plaintiff would be pleased if he continued to hold his shares "because the longer term performance of the shares would improve due to the actions he was taking to clean up the governance issues that [plaintiff] had identified." The complaint alleged all defendants had actual knowledge those representations were made "and were false at the time they were made," and defendants had no intention "of conducting any investigation sufficient to insure the truth or accuracy of the Banc's publicly filed financial disclosures."

Plaintiff relied on Lashley's assurances, because soon after, an April 10 investor presentation and accompanying Form 8-K filing "appeared to address, and quickly, some of the important issues that I had raised with Lashley during our call on April 6." Plaintiff alleged these turned out to be "cosmetic changes."

Earnings per share missed the January 30, 2017 guidance by over 60 percent.

11

### b. Contentions and conclusions

To begin, we state the categories of activity protected under the anti-SLAPP statute: any written or oral statement or writing (1) "made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law" or (2) "made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law" or (3) "made in a place open to the public or a public forum in connection with an issue of public interest," or (4) "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16. subd. (e)(1)–(4).)

As mentioned at the outset, Banc defendants sought to strike the inducement claims in their entirety. They relied on both section 425.16, subdivision (e)(2) (statements made in connection with an issue under consideration or review, in this case by the SEC), and on subdivision (e)(4) (statements in connection with a public issue or an issue of public interest).

We agree with the Banc defendants that statements Banc made in its Forms 8-K and 10-Q are protected under section 425.16, subdivision (e)(2) as matters under review and consideration by the SEC. Indeed, statements on governance issues related directly to the subject matter of the then-pending investigation the SEC began on January 12, 2017. Statements related to financial projections were also protected under subdivision (e)(4), as matters of public interest. Defendant Lashley's statements on April 6, 2017, were protected, as they were closely related to the investor presentations and governance

12

issues that were the subject of Form 8-K and 10-Q filings at the SEC.

  **i. Section 425.16, subdivision (e)(2)**

    **(1) The investor presentations and accompanying SEC filings**

  In our separate opinion in the Brown appeal, we concluded that statements in an audit report attached to a 10-K annual report filed with the SEC were protected statements made "in connection with an issue under consideration or review" by the SEC.  (§ 425.16, subd. (e)(2).)  We explained that the SEC is required by law to review disclosures made by issuers of securities, "including reports filed on Form 10-K," "on a regular and systematic basis" and no less frequently "than once every 3 years." (15 U.S.C. § 7266, subds. (a) & (c).)  "Such review shall include a review of an issuer's financial statement."  (15 U.S.C. § 7266, subd. (a).)  This alone, we concluded, subjected plaintiffs' claims against Banc's lead auditor, based on the 10-K report, to the anti-SLAPP statute.  (*Sugarman v. Brown, supra*, B308318.)

  Here, we reach the same conclusion with respect to the Form 8-K and Form 10-Q filings at issue.  Those SEC filings and the related investor presentations were protected activity under section 425.16, subdivision (e)(2).

  In *Hawran, supra,* 209 Cal.App.4th 256, "the trial court found [the defendant company's] Form 8-K put the issues identified in the form under consideration or review by the SEC," and that the company's press release, "from which [the plaintiff's] claims arose, was thus protected as a writing 'made in connection with an issue under consideration or review by . . . any other official proceeding authorized by law,' " quoting section 425.16, subdivision (e)(2). (*Hawran,* at p. 269.)  The Court of Appeal

continued: "This finding alone subjects [the plaintiff's] claims to section 425.16." (*Ibid.*) In *Hawran,* the court went on to explain the plaintiff did not challenge the trial court's finding on appeal, so the court "need not reach the correctness of that finding." (*Id.* at p. 270.)

We think the trial court in *Hawran* correctly found the defendant's Form 8-K and press releases were protected. Indeed, in connection with a different issue, *Hawran* observed that the Form 8-K "was filed for the purpose of complying with the SEC's mandatory disclosure requirements," and "may constitute a writing before an official proceeding." (*Hawran, supra,* 209 Cal.App.4th at p. 281.) As we noted earlier, Form 8-K filings are required by the SEC to report specified material changes and other events the registrant deems important to investors. "The SEC's reporting requirement is designed to make accurate information available to the investing public, and the mandatory filings allow the SEC to determine whether to investigate a particular transaction." (*Id.* at p. 263, fn. 2.) These requirements subject the information reported to SEC review, and accordingly the statements in the reports are protected under section 425.16, subdivision (e)(2).

Plaintiff contends the investor presentations and Form 8-K and Form 10-Q statements are not protected, because the investor presentations were not designed to trigger an SEC investigation, and because not every statement to the SEC is protected. We do not agree that an SEC filing must be designed to trigger an investigation in order to be protected activity, and the cases plaintiff cites do not persuade us otherwise. Whether or not *all* statements to a regulator are protected, it is clear to us that *these* statements are.

14

Plaintiff relies heavily on *Moser v. Encore Capital Group, Inc.* (S.D.Cal., May 2, 2006, No. 04CV2085) 2006 U.S. Dist.Lexis 109142. That case involved allegedly defamatory statements in a Form S-1, a registration statement required before securities may be sold. (*Id.* at p. *11.) The district court observed that "no report of wrongdoing or purpose of triggering an investigation is involved in the filing of a Form S-1" (*id.* at p. *18), and "[t]he specifics of the employment dispute between [the plaintiff] and [the defendant] were irrelevant to the SEC's determination whether [the defendant] may sell securities more than two years after the employment dispute" (*id.* at pp. *20–21). The court concluded: "Since the purpose of a Form S-1 is not to trigger or commence an investigation, *and* since the employment dispute . . . was not an issue under consideration or review before the SEC," the defendants failed to meet their burden to show protected activity. (*Id.* at p. *21, italics added.)

Whether or not one agrees with *Moser,* the case is inapt here. Unlike the two-year-old employment matter reported in Form S-1 filed to obtain authorization to sell stock, here the "issue under consideration or review" *is* the very subject matter of the 8-K filings and investor presentations: the company's financial projections. *Moser* is irrelevant. Plaintiff also cites *ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1009 and *Fontani v. Wells Fargo Investments, LLC* (2005) 129 Cal.App.4th 719, 731–732,[1] cases that involved communications soliciting an investigation (*ComputerXpress*) and

---

[1] *Fontani* was disapproved on other grounds in *Kibler v. Northern Inyo County Local Hospital Dist.* (2006) 39 Cal.4th 192, 203, footnote 5.

15

reporting misconduct and triggering an investigation (*Fontani*). Those cases do not hold that regulatory filings are protected activity only if they were designed to trigger an investigation or report misconduct.[2]

### (2) The Lashley conversation

Plaintiff contends that defendant Lashley's private statements to him during the April 6, 2017 telephone conversation are not protected "for similar reasons." We have rejected those reasons. Mr. Lashley's statements related directly to the investor presentations. For example, plaintiff pointed out disclosures he

---

[2] Plaintiff cites other inapt cases. (*A.F. Brown Electrical Contractor, Inc. v. Rhino Electric Supply, Inc.* (2006) 137 Cal.App.4th 1118, 1129 [stop notices a contractor served on a school district, requiring the district to withhold funds due the general contractor, did not involve an "official proceeding" and subdivision (e)(1)—statements "made before a[n] official proceeding"—was inapplicable]; *City of Industry v. City of Fillmore* (2011) 198 Cal.App.4th 191, 215 [claims based on the routine filing of tax returns at the State Board of Equalization, which transmits tax revenues to local jurisdictions based on the returns, do not arise from protected activity]; *DeFrees v. Kirkland* (C.D.Cal. Aug. 23, 2012, Nos. CV 11-4272; CV 11-4574) 2012 U.S.Dist.Lexis 195922 [denying frivolous anti-SLAPP motion; suit was based on defendants raiding the company, not on protected speech]; *Rand Resources, LLC v. City of Carson* (2019) 6 Cal.5th 610, 627 [alleged promissory fraud in a statement made to the plaintiff about renewal of an exclusive agency agreement; statement was made two years before the renewal issue even came before the City Council].) Plaintiff requests judicial notice of the complaint in the *DeFrees* case, which mentions a Form 8-K and a Form 10-Q amendment, "similar to the SEC filings at issue in this case." That changes nothing in our evaluation of *DeFrees,* and so we deny the request for judicial notice.

16

believed were false in the March 6, 2017 presentation, and Mr. Lashley assured him he would conduct a full review of the disclosures and ensure they were reliable and accurate. The connection between Mr. Lashley's statements and the investor presentations and SEC filings is clear, and Mr. Lashley's statements are protected under subdivision (e)(2) as well.

### ii. Section 425.16, subdivision (e)(4)

Section 425.16, subdivision (e)(4) protects any conduct in furtherance of the exercise of free speech or petition rights "in connection with a public issue or an issue of public interest" (*ibid.*), and is referred to as "the catchall provision" (*FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133, 140 (*FilmOn*)). As we concluded in our separate opinion on defendant Turner's anti-SLAPP motion, statements about Banc's financial projections made in earnings calls, and in the 8-K reports to the SEC were public statements relating to Banc's financial position and were likely to impact individual investors and the market. They therefore qualify as protected activity under the catchall provision.

"[A] publicly traded company with many thousands of investors is of public interest because its successes or failures will affect not only individual investors, but in the case of large companies, potentially market sectors or the markets as a whole." (*Global Telemedia Int'l, Inc. v. Doe 1* (C.D.Cal. 2001) 132 F.Supp.2d 1261, 1265.) The financial projections of a large, publicly traded company like Banc are of great interest to a significant community of investors.

Consequently, we have no difficulty concluding that statements by Banc and Banc individuals at investor presentations and on earnings calls, and the earnings guidance in the 10-Q report, had a high " 'degree of closeness' " (*FilmOn, supra,*

17

7 Cal.5th at p. 150) to the public interest in the performance of a publicly traded company. Those statements were thus made "in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4).)

**[Begin nonpublished portion]**

## 2. The Inducement Claims: Probability of Prevailing

We conclude plaintiff failed to make a prima facie showing he would prevail on his fraudulent and negligent inducement claims against Banc and Banc individuals.

Plaintiff contends he submitted evidence that Mr. Lashley's representations in the April 2017 telephone conversation were false and meant to convince plaintiff to continue holding his shares. Plaintiff cites his own declaration and the complaint, without acknowledging that objections were sustained to much of the cited evidence.

We do not think plaintiff came close to showing anything Mr. Lashley said was false. Mr. Lashley responded to plaintiff's concerns about the $2 earnings-per-share guidance, and his concerns relating to "malfeasance and potentially false and misleading disclosures at Banc." Mr. Lashley assured plaintiff his concerns would be investigated "and, if appropriate, action would be taken to disclose and correct them."

We see nothing in the evidence showing Mr. Lashley's assurances were false when made. Indeed, plaintiff admits that changes were made to the financial projections in the next (April 10, 2017) investor presentation; he simply criticizes them as "cosmetic." Plaintiff offers no proof that Mr. Lashley did not investigate his concerns. In sum, plaintiff failed to state a prima facie case of fraudulent (or negligent) inducement to hold securities, which requires the same showing as any other kind of

18

misrepresentation claim. (See *Small v. Fritz Companies, Inc.* (2003) 30 Cal.4th 167, 173–174; cf. *id.* at p. 184 ["a complaint for negligent misrepresentation in a holder's action should be pled with the same specificity required in a holder's action for fraud"].)

Next, plaintiff contends that defendant Boyle's statements during the May 3, 2017 earnings call were false, that defendant Grosvenor was also on the call, and that other director defendants, as members of the audit committee, approved the earnings call. On that call, Mr. Boyle stated Banc needed to amend its earlier $2 earnings-per-share guidance, but plaintiff alleges he gave only one reason and did not include "other pertinent problems at Banc," instead focusing on the financial strength and stability of Banc, "which was knowingly false." Plaintiff shows no probability of prevailing on this claim either.

Statements or predictions about future events are deemed nonactionable opinions. Plaintiff cites federal district court cases stating that forward-looking statements accompanied by cautionary language are not immunized under federal securities laws where "plaintiffs have alleged facts suggesting that defendants had actual knowledge of the falsity of their statements." (E.g., *In re PMI Group, Inc.* (N.D.Cal. Nov. 2, 2009, No. C 08-1405) 2009 U.S.Dist.Lexis 101582, at p. *11 (*PMI Group*).) These cases do not help plaintiff, who presented no admissible evidence suggesting that defendants knew the earnings guidance or statements in the earnings call were false when made.

Plaintiff says we may infer knowledge of falsity of the earnings guidance, and defendants' intent to induce plaintiff to hold his shares, from other evidence. Plaintiff cites conversations between defendants Boyle and Turner in April 2017, "admitting that Banc's earnings results had not come in and they would look

19

to blame [plaintiff] for that and Banc's continued failures to meet earnings going forward." That *post hoc* evidence, however, plainly has no bearing on the earnings guidance at the time it was issued.

Plaintiff says falsity and fraudulent intent may also be inferred from defendants' attempts to pump up earnings by liquidating capital assets, their participation in the cancellation of bonuses to inflate Banc's earnings, and "their attempts to intimidate and silence any potential whistleblowers." Plaintiff does not explain why we should infer from these alleged activities that defendants intended to induce him not to sell his stock by issuing false earnings guidance, and we are not persuaded to draw that inference. As the *PMI Group* case that plaintiff cites says, an inference of scienter must be more than merely reasonable or permissible, but must be " 'cogent and compelling.' " (*PMI Group, supra,* 2009 U.S.Dist.Lexis 101582, at p. *7.)

Plaintiff also cites *his own declaration quoting from his complaint*—and nothing more—as "evidence" that Mr. Turner "acknowledged to others that as early as February 2017, earnings per share were coming in well below guidance and Banc was seeking to manipulate earnings to obscure that fact from the market and [plaintiff]." Mr. Turner told other employees, plaintiff says, "including Jeff Seabold, the then-Vice Chairman at Banc, that he wanted to sell any asset that could generate a profit 'that was not bolted to the ground,' since earnings were well below public expectations." Plaintiff offered no declaration from Mr. Seabold or "others." Plaintiff neglected to mention in his brief that Mr. Turner's objection to his declaration was sustained. Plainly, recitation of the complaint in his declaration is not evidence.

20

Finally, plaintiff asserts that his negligent misrepresentation claim "has minimal merit for similar reasons." Just as we are unable to infer falsity and fraudulent intent from the evidence plaintiff cited, we similarly see no basis for inferring defendants had no reasonable ground for believing the truth of their financial projections at the time they were made.

In short, plaintiff has not established a prima facie case for his claims of fraudulent and negligent inducement to hold securities. The trial court should have struck those causes of action in their entirety.

3. **The Tortious Interference and UCL Claims: Protected Activity**

a. **The allegations and evidence**

In his claims for violation of the Labor Code (blacklisting), tortious interference with prospective economic advantage, violation of the UCL and conspiracy to violate the UCL, plaintiff alleged that defendants made disparaging statements that caused him reputational harm and interfered with his business relationships after he left Banc.

The Banc defendants' anti-SLAPP motions contended, among other things, that all the challenged statements addressed plaintiff's tenure at and departure from Banc, and were protected activity under section 425.16, subdivision (e)(4), as statements or conduct "in connection with . . . an issue of public interest." Plaintiff argued otherwise.

Plaintiff alleged Banc defendants "made misrepresentations about [plaintiff] to the press, banking journals, investment banking firms, regulators, auditors, and other banking industry participants, including rival banks in order to harm [plaintiff's] ability to gain subsequent employment." These included

statements that plaintiff "engaged in misconduct as CEO of Banc, committed illegal acts, and instituted harmful business practices at Banc." Plaintiff further alleged he had "various economic relationships" with 17 entities, and Banc defendants engaged in "various forms of wrongful acts which they knew would disrupt the aforementioned economic relationships."

Similarly, plaintiff's complaint alleged that Banc defendants engaged in unfair competition against plaintiff by pressuring third parties not to do business with him, and by making false and defamatory statements that plaintiff had engaged in unlawful behavior. The complaint alleged plaintiff and defendants are competitors, and defendants' attacks on plaintiff's "reputation, relationships, financial strength, and ability to fairly compete with Banc" were made "in order to keep [plaintiff] from competing with the Defendants in the banking business and within private equity and financial services." This resulted in plaintiff's inability to pursue suitable replacement employment or other profitable partnerships with banks and other financial services organizations.

As for the evidence, plaintiff submitted a declaration from Martice Mills, a bank employee until November 2017, who stated that defendant Boyle and others "discussed how they were going to make sure that [plaintiff] was 'crushed.'" Mr. Mills further stated they discussed how to blame plaintiff for everything negative at Banc. They also said they knew what they were doing would cause plaintiff's future ventures to fail, and they wanted them to fail, "or the suggestion that he was to blame would not be as plausible." Mr. Mills described other conversations among Banc employees where Mr. Boyle stated that plaintiff "did improper and illegal things while CEO of Banc," and he "understood them to be

22

communicating that [plaintiff] had been fired by the Company for breaking securities and other laws and was the cause and focus of the SEC investigation."

A declaration from Paul Simmons, chief credit officer of Banc at the time, stated he attended an investor conference in March 2017. He was standing with Mr. Turner and defendant Boyle, when "[n]umerous analysts and investors approached us to find out what really happened with [plaintiff's] departure. Turner and Boyle told the analysts and investors that [plaintiff] was unethical, that he had broken securities laws and bank regulations, that he had engaged in self-dealing, that Banc was hard pressed to recover from the damage that he had done to Banc."

In his declaration, plaintiff identified several entities with whom he had economic relationships, and he contends he and his ventures "were denied business and financing opportunities" as a result of pressure defendants put "on Banc investors, potential investors, and [plaintiff's] potential business and financing contacts." The Simmons declaration stated that J.P. Morgan Chase, Silvergate, Texas Capital Bank and Wells Fargo "declined to do business with" one of plaintiff's businesses, and the Mills declaration stated Aaron Wade "delayed his investments and loan acquisitions" from another of plaintiff's ventures.

Plaintiff cites his own declaration, which related hearsay statements about disparaging things several defendants said about him. Plaintiff does not mention that Banc defendants' objections to this evidence were sustained.

Plaintiff identified several community nonprofit organizations, to which Banc had previously made donations. Plaintiff's complaint alleged that in 2019, Banc employee Christopher Garcia was instructed by various individual

23

defendants to tell those nonprofit organizations that plaintiff engaged in misconduct while CEO, had fraudulent business dealings, and that Banc would withhold donations if they associated with plaintiff.

Banc filed a declaration from Mr. Garcia in support of its anti-SLAPP motion, denying that he made any such statements, and denying that defendants instructed him to make false or defamatory statements about plaintiff. In opposition, plaintiff submitted a declaration from Gary Dunn, who was Banc's Community Reinvestment Act officer until he retired on September 30, 2018. Mr. Dunn's declaration recounts various hearsay conversations he had with Mr. Garcia and nonprofit personnel in 2019, objections to which were sustained.

Plaintiff did not offer any declarations from any of the companies or nonprofit organizations that he alleges declined to do business with him.

**b.     Contentions and conclusions**

We conclude that all the statements concerning the circumstances surrounding plaintiff's departure from Banc, including statements that plaintiff engaged in misconduct, illegal activities, and the like, were protected activity under subdivision (e)(4), as communications related to an issue of public interest. This includes communications to the press, regulators, auditors, nonprofits, investors, rival banks and other banking industry participants. All were part of a very public controversy over the circumstances of plaintiff's departure from the bank.

Our analysis, which also appears in our separate opinion in the Turner appeal, is informed by *FilmOn,* which provides direction on how a court should analyze whether communications qualify for anti-SLAPP protection under the catchall provision.

24

(*FilmOn, supra,* 7 Cal.5th at pp. 142–143.)  The court first concluded that we "must consider the context as well as the content of a statement in determining whether that statement furthers the exercise of constitutional speech rights in connection with a matter of public interest."  (*Id.* at p. 149.)  The court then explained:

"The inquiry under the catchall provision . . . calls for a two-part analysis rooted in the statute's purpose and internal logic.  First, we ask what 'public issue or . . . issue of public interest' the speech in question implicates—a question we answer by looking to the content of the speech.  (§ 425.16, subd. (e)(4).)  Second, we ask what functional relationship exists between the speech and the public conversation about some matter of public interest.  It is at the latter stage that context proves useful."  (*FilmOn, supra,* 7 Cal.5th at pp. 149–150.)

"In articulating what constitutes a matter of public interest, courts look to certain specific considerations, such as whether the subject of the speech or activity 'was a person or entity in the public eye' or 'could affect large numbers of people beyond the direct participants' (*Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 898 []); and whether the activity 'occur[red] in the context of an ongoing controversy, dispute or discussion' [citation], or 'affect[ed] a community in a manner similar to that of a governmental entity' [citation]."  (*FilmOn, supra,* 7 Cal.5th at pp. 145–146.)

"We are not concerned with the social utility of the speech at issue, or the degree to which it propelled the conversation in any particular direction; rather, we examine whether a defendant— through public or private speech or conduct—participated in, or furthered, the discourse that makes an issue one of public interest."  (*FilmOn, supra,* 7 Cal.5th at p. 151.)  "[A] statement is

made 'in connection with' a public issue when it contributes to—that is, 'participat[es]' in or furthers—some public conversation on the issue.  [Citation.]  But the inquiry of whether a statement contributes to the public debate is one a court can hardly undertake without incorporating considerations of context—including audience, speaker, and purpose." (*Id.* at pp. 151–152.)

In *FilmOn,* the defendant provided confidential reports to its clients that labeled websites as containing "adult content" or "copyright infringement" material, and one of the websites sued the defendant, alleging disparagement of its digital distribution network.  (*FilmOn, supra,* 7 Cal.5th at p. 140.)  The reports were issued privately, "to a coterie of paying clients," who use the information "for their business purposes alone.  The information never entered the public sphere, and the parties never intended it to." (*Id.* at p. 153.)  The court found the defendant's reports "—generated for profit, exchanged confidentially, without being part of any attempt to participate in a larger public discussion—do not qualify for anti-SLAPP protection under the catchall provision, even where the topic discussed is, broadly speaking, one of public interest.  This is not because confidential statements made to serve business interests are categorically excluded from anti-SLAPP protection.  It is instead because [the defendant's] reports are too tenuously tethered to the issues of public interest they implicate, and too remotely connected to the public conversation about those issues, to merit protection under the catchall provision." (*Id.* at p. 140.)

In contrast to the reports involved in *FilmOn*, here, the circumstances of plaintiff's departure from Banc were a topic of considerable public discussion at the time.  Beginning on

26

October 18, 2016, when the blog post first publicized the allegations against Banc and plaintiff, the record is replete with public discussion of Banc, plaintiff's conduct at Banc and his departure on January 23, 2017. There were press releases from Banc, securities fraud lawsuits, an SEC investigation, and articles on websites and in the Los Angeles Times and other publications. By way of example of the last category, a Bloomberg Law news story on March 2, 2017, about Banc's 10-Q and 10-K filings states "[a]dverse opinion on internal controls due to 'inadequate tone at the top' isn't surprising given former CEO Steven Sugarman's quick exit, inaccurate press release in Oct., historically-weak corporate governance, excessive related-party transactions" and that "Banc disclosed other related-party transactions from Sugarman era that it's taken steps to curtail." (Maranz, *Banc of California's 'Clean' Filings Remove Overhang:  FBR,* Bloomberg Law (Mar. 2, 2017).)

In short, as the trial court aptly put it, "review of the complaint and filings in this motion disclose the high-profile nature of [plaintiff's] departure from Banc," so that statements "related to [plaintiff's] tenure at and departure from Banc are issues of public interest." Plaintiff " 'was a person . . . in the public eye' " and the speech occurred " 'in the context of an ongoing controversy, dispute or discussion' " (*FilmOn, supra,* 7 Cal.5th at p. 145), so we have no doubt the reason for plaintiff's departure was a matter of public interest.

That brings us to "addressing the specific nature of defendant's speech and its relationship to the matters of public interest." (*FilmOn, supra,* 7 Cal.5th at p. 152.) Here, the requisite connection between the challenged statements and the issue of public interest is direct, not tenuous or remote. Defendants'

27

communications to the press and others after plaintiff resigned reflected Banc's position in the ongoing, very public controversy about Banc's and plaintiff's conduct. The context—audience, speaker and purpose—demonstrate defendants' speech was "in connection with" an issue of public interest, as required by *FilmOn.*

Plaintiff insists defendants' statements "were made for the private purpose of 'crushing' Sugarman," were "private conversations meant to be kept private," and did not "contribute to public conversation" as specified in *FilmOn.* Yet plaintiff offered evidence that defendants made statements about him to "[n]umerous" analysts and investors at a conference of securities analysts and institutional investors, to whom plaintiff was well known. Plaintiff says defendants' statements to other banks and to the press caused Pacific Premier Bank, Royal Bank, J.P. Morgan Chase, Citibank and several others to decide not to work with plaintiff or companies associated with him. Banc's statements, both private and public, all related directly to the issue under public discussion.

Much of plaintiff's brief is spent discussing *Murray v. Tran* (2020) 55 Cal.App.5th 10. In *Murray,* unlike here, there was no ongoing public conversation about the issue of public interest— which was the plaintiff's competence as a dentist. (*Id.* at p. 30.) The court found, for example, that certain of the challenged statements were not made to patients or anyone outside the parties' dental practice, and were made solely for private purposes, such as to enhance the quality of dental care at the practice. (*Id.* at p. 36.) Here, by contrast, there clearly was an existing public discussion about the circumstances surrounding plaintiff's departure from Banc.

28

As *FilmOn* tells us, "[w]e are not concerned with the social utility of the speech at issue," but rather with whether a defendant "participated in, or furthered, the discourse that makes an issue one of public interest." (*FilmOn, supra,* 7 Cal.5th at p. 151.) That standard is met here.

### c. Plaintiff's commercial exemption claim

Plaintiff contends that even if Banc statements to investors and potential investors would otherwise qualify as protected activity, the statements are exempt from the anti-SLAPP statute under the commercial speech exemption in section 425.17, subdivision (c) (section 425.17(c)). Plaintiff is wrong. As *FilmOn* and other cases tell us, the exemption covers only a subset of commercial speech: comparative advertising. (*FilmOn, supra,* 7 Cal.5th at p. 147.) The statements plaintiff cites in his brief do not bear any resemblance to comparative advertising.

Plaintiff appears to acknowledge that he must establish the defendants' alleged statements constituted comparative advertising, but all he says on the point is this: "Not only did Banc Defendants disparage Sugarman, but they also touted Banc in an effort to secure clients." For this point he cites five statements from the declaration of Martice Mills. Objections were sustained to all the statements plaintiff relies on from the Mills declaration. Mr. Mills described hearsay statements by representatives of CIT Bank and East West Bank that they might invest in Banc "now that Mr. Sugarman was gone." Mr. Mills also described a double hearsay statement by Mr. Turner that Banc's new CEO told potential investors that "now that [plaintiff] was out at Banc, Banc could be operated properly and legally."

We do not see how any of these statements could conceivably be considered "comparative advertising," or otherwise fit within

29

the specifications of section 425.17(c), and plaintiff cites no authority remotely suggesting that statements of the kind he cites meet the requirements of the statute.

## 4. The Tortious Interference Claim: Probability of Prevailing

Plaintiff did not satisfy his burden of showing a probability of prevailing on his claim against Banc defendants of intentional interference with prospective economic advantage. (Plaintiff makes no argument in his briefs concerning the merits of the blacklisting claim, so we need not discuss it separately.) The elements of the tort are " ' "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." [Citations.]' " (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1153 (*Korea Supply*).) "[T]he third element also requires a plaintiff to plead intentional *wrongful* acts on the part of the defendant designed to disrupt the relationship." (*Id.* at p. 1154.)

Plaintiff contends he established a probability of future economic benefits that Banc defendants disrupted. He cites to the record, without identifying or describing the evidence he cites. As it happens, objections were sustained to all of it, although plaintiff does not tell us this until the final part of his opening brief.

Plaintiff contends the trial court abused its discretion in sustaining "certain of Banc Defendants' evidentiary objections based on hearsay, lack of foundation, and lack of personal knowledge." Plaintiff says the court "inconsistently ruled" on

30

objections by the various defendants, citing the record but not describing the testimony, the objection or the rulings. He says that his evidence is not hearsay. He says "many of the statements" are admissions by Banc defendants. He says that his own declaration and those of former Banc employees (Mr. Mills, Mr. Simmons, Heather Endresen, and Mr. Dunn) "concerning statements made by other Banc employees, including Turner, Boyle, Benett, Grosvenor, and Garcia" are party admissions that are "inconsistent with positions taken by them in this action," and again cites to the record without identifying the declaration or describing the statements.

Plaintiff says his opposing declarations describe "first-hand knowledge" of statements by Banc defendants that are inconsistent with Banc defendants' supporting declarations, and so are admissible as prior inconsistent statements. Again, he string-cites his own and other declarations without identifying them, and without connecting them to any particular Banc declaration.

For example, plaintiff cites defendant Benett's declaration, where Mr. Benett states he "never made statements to anyone with the intent to prevent Sugarman from being hired in any capacity," and he "was not aware that Sugarman had any economic relationships with any of the entities listed" in the complaint and did not "make any statements with the intent to disrupt any economic relationship Sugarman sought or had with those entities." Then plaintiff cites his opposing declarations, none of which describes *any* "first-hand knowledge" of Mr. Benett making such statements. The court is not obliged to look up a string of unidentified citations to evidence to see if and how one of them might support plaintiff's claim—that is plaintiff's burden to explain, and he has not done so.

31

The only testimony plaintiff discusses at any length is Mr. Dunn's declaration about Mr. Garcia's statements to various nonprofit entities, which we described above. Mr. Dunn's testimony was excluded, and plaintiff claims that was error because testimony with multiple layers of hearsay is admissible if it consists of admissions and prior inconsistent statements. Plaintiff says the board's statements to Mr. Garcia are admissions, and Mr. Garcia's statements to Mr. Dunn are inconsistent with Mr. Garcia's declaration.

We need not enter this thicket of contentions, because regardless of Mr. Dunn's evidence, plaintiff has not made a prima facie case of tortious interference with prospective economic advantage based on his relationships with the nonprofit organizations. The tort requires an economic relationship with a probable future economic benefit, defendant's knowledge of the economic relationship, and its actual disruption. (*Korea Supply, supra,* 29 Cal.4th at p. 1164.)

Plaintiff cites only his own declaration that he had "existing relationships" with two nonprofits: National Diversity Coalition and National Asian American Coalition. National Diversity Coalition provided a community advisory board for one of plaintiff's companies and "helped distribute loans to underserved communities." This resulted in "important economic opportunities being extended to those communities and resulted in joint ventures" between plaintiff's companies and the Coalition. Plaintiff stated he "[l]ost advisory board members who were critical to expanding markets and executing deals and we lost partners for distributing loans in markets." National Asian American Coalition was a "similar situation," with the nonprofit "back[ing] out of our deal to form joint ventures to acquire FHA

32

non-performing loan pools to rehab and rent foreclosed homes to underserved communities."

This is not the sort of evidence of a specific "business relationship and corresponding expectancy" for plaintiff that is required to establish interference with prospective economic advantage. Moreover, plaintiff has produced no evidence that any defendants knew of these anticipated "deal[s]" with the nonprofits to distribute loans or form joint ventures. Banc knew plaintiff had relationships with the nonprofits; that is why Banc made donations to them. But plaintiff presented no evidence the Banc defendants knew of the economic relationships—the prospective "deals" plaintiff describes in his declaration.

Returning to plaintiff's claims of error in sustaining objections to his tortious interference evidence, he next cites Evidence Code section 1250. He claims "many of the statements" are admissible because they are offered to prove the customer's "then-existing state of mind" and "their motives for doing or not doing business with Banc or Sugarman." Once again, plaintiff merely string-cites the record without identifying or describing the evidence to explain, if he can, why the "existing state of mind" exception to the hearsay rule would apply to any of the "many" statements in question.

Finally, plaintiff cites *Sweetwater Union High School Dist. v. Gilbane Building Co.* (2019) 6 Cal.5th 931, which held that "evidence may be considered at the anti-SLAPP motion stage if it is reasonably possible the evidence set out in supporting affidavits, declarations or their equivalent will be admissible at trial." (*Id.* at p. 947.) Hearsay and irrelevant evidence are not admissible at trial.

33

In sum, plaintiff has demonstrated no abuse of discretion in the trial court's evidentiary rulings, and there is no admissible evidence sufficient to satisfy the elements of a claim of tortious interference with prospective economic advantage against Banc defendants.

**5.   The Defamation Claims:  Protected Activity**

**a.   The allegations and evidence**

In his defamation claim, plaintiff alleged Banc and defendants Benett, Schnel, Sznewajs, and Lashley (the defamation defendants) made defamatory statements about plaintiff "from 2019 through the present."  These included statements accusing plaintiff of misconduct during his time as Banc's CEO and accusing his companies of having ties to a convicted securities fraudster, as well as statements that plaintiff was forced out for misconduct.  The complaint also alleged that in 2019, the defamation defendants told the Office of the Comptroller of the Currency (OCC), Ernst & Young (Banc's auditors), and incoming Banc CEO Jared Wolff that plaintiff was forced out due to misconduct.

As discussed above, the complaint alleged that in 2019, the defamation defendants instructed bank employee Christopher Garcia to tell six nonprofit community organizations that plaintiff "engaged in illegal conduct while CEO at Banc and that he engaged in fraudulent business dealings."

Last, the complaint alleged that two letters authorized by the defamation defendants in January 2020 were defamatory.  One letter was sent by a lawyer to plaintiff, his wife, his father and Commerce Home Mortgage (a company related to plaintiff), saying plaintiff was forced to resign as a result of his wrongdoing, issued an inaccurate press release, interfered with the special committee's

investigation, and so on.  A second letter from Banc was sent to all of Banc's Class B common stock holders and Commerce Home Mortgage making similar statements.

### b. Contentions and conclusions

We have already concluded Mr. Benett's statements to other entities in the financial services business, and Mr. Garcia's statements to the various nonprofit companies were protected activity.  As we explained, these statements were protected under section 425.16, subdivision (e)(4), as communications related to an issue of public interest:  all were part of the very public controversy over the circumstances of plaintiff's departure from the bank.  (See discussion at pp. 24–29, *ante.*)

The same conclusion applies to defendants' statements to the OCC and Ernst & Young, and the January 2020 letters.  These communications, like the others we have already discussed, and for the reasons we have already discussed, were communications related to an issue of public interest.

Plaintiff once again contends that statements to the OCC and to Ernst & Young were "private statements," not part of the public conversation, and therefore do not meet *FilmOn'*s requirements.  Our previous analysis applies here in full.  Given the audience (the OCC regulates national banks, and Ernst & Young are Banc's auditors) and the nature of defendants' statements (the circumstances of plaintiff's departure from Banc), there is clearly a sufficient relationship between the speech and the issue of public interest.

The same principle applies to the January 2020 letters, which were precipitated by plaintiff's demands on Banc.  The first letter recited in detail plaintiff's claims of present and past wrongdoing at Banc, including matters surrounding his

resignation, and concluded with a warning of "further litigation" if plaintiff's demands were not met.

Plaintiff argues the January 2020 letters were sent three years after the events relevant to the defamatory statements took place, and there was no longer an ongoing dispute. The relevant question is not confined to an ongoing "dispute"—*FilmOn* refers to "whether the activity 'occur[red] in the context of an ongoing controversy, dispute *or discussion*' " (*FilmOn, supra,* 7 Cal.5th at p. 145, italics added). And, anyway, the dispute was not over—the parties agreed to settle the class action, subject to the occurrence or waiver of seven events, including court approval, which did not occur until March 2020, well after the January 2020 letters.[3] The letters are well within the *FilmOn* analysis.

## 6.   The Defamation Claims:  Probability of Prevailing

Plaintiff cannot prevail on the merits of any of his defamation claims. Some of the statements are arguably privileged, or were barred by the statute of limitations, or were not shown by admissible evidence. But in every case, plaintiff has not shown the statements were made with malice.

Plaintiff does not challenge the conclusion that he is a public figure. (See *Reader's Digest Assn., Inc. v. Superior Court* (1984) 37 Cal.3d 244, 253–254 [describing "the 'limited purpose' or 'vortex' public figure, an individual who 'voluntarily injects himself or is

---

[3]     Plaintiff requested and we grant judicial notice of the stipulation of settlement filed October 30, 2019, entered into between Banc and the class action plaintiffs in the securities fraud litigation. As observed in the text, the timing of the stipulation does not establish the dispute was over when the stipulation was filed.

drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues' "; "[u]nlike the 'all purpose' public figure, the 'limited purpose' public figure loses certain protection for his reputation only to the extent that the allegedly defamatory communication relates to his role in a public controversy"].) The consequence is that plaintiff must show malice. (*Id.* at p. 256 ["If the person defamed is a public figure, he cannot recover unless he proves, by clear and convincing evidence [citation], that the libelous statement was made with ' "actual malice"—that is, with knowledge that it was false or with reckless disregard of whether it was false or not.' "].)

"There is a 'significant difference between proof of actual malice and mere proof of falsity.' [Citation.] 'The burden of proving "actual malice" requires the plaintiff to demonstrate with clear and convincing evidence that the defendant *realized* that his statement was false or that he *subjectively entertained serious doubt as to the truth of his statement*.' " (*Reed v. Gallagher* (2016) 248 Cal.App.4th 841, 862 (*Reed*); see *ibid.* ["We could, in an appropriate case, infer actual malice from a statement that was so obviously false that any reasonable person would have known that the statement was untrue."].)

Plaintiff insists he established actual malice because the Banc defendants knew their statements were false, citing the defendants' declarations filed in support of the anti-SLAPP motions. These declarations describe, for example, the October 18, 2016, press release about the blog post; the inaccuracies in it; and the director defendants' loss of confidence in plaintiff, leading them to advise plaintiff they would vote to terminate him for cause unless agreement could be reached on the terms of his resignation.

37

The Banc defendants' declarations do indeed show personal knowledge of the circumstances surrounding plaintiff's departure and the press release. What they do *not* show is that, when defendants allegedly made the statements plaintiff claims are defamatory, defendants " 'realized that [their] statements [were] false or that [they] subjectively entertained serious doubt as to the truth of [their] statement[s].' " (*Reed, supra,* 248 Cal.App.4th at p. 862, italics omitted.)

Plaintiff contends the Banc defendants' effort to cover up their own misconduct, personally financially benefit, and blame Banc's underperformance on Sugarman, and their anger, hostility, and ill-will toward Sugarman, including their desire to "crush" Sugarman, are evidence of malice. Plaintiff then provides seven lines of record citations, without identifying or describing any of them, and without distinguishing between testimony that was excluded and testimony that was admitted. Much of it was excluded. The testimony about making sure plaintiff was "crushed" at most demonstrates ill-will toward plaintiff—and " 'evidence of ill will, personal spite or bad motive' " alone is insufficient to permit an inference of actual malice. (*Overstock.com, Inc. v. Gradient Analytics, Inc.* (2007) 151 Cal.App.4th 688, 709.)

### 7. The UCL Claims: Probability of Prevailing

Plaintiff's UCL claims arise from the same protected activity we have discussed in connection with his tortious interference and defamation claims.

Plaintiff contends he established a reasonable probability of prevailing on his UCL claim "because he is entitled to injunctive relief and restitutionary damages," and "the claims that predicate [plaintiff's] UCL claims are sufficiently established." As shown in

our previous discussion of the tortious interference and defamation claims, the "predicate" claims have *not* been established. Plaintiff offers no other argument on this subject in his combined opening brief—either in his response to Banc defendants' appeal, or in his opening brief on his own appeal. Consequently, we need not consider the arguments he makes in his reply brief—to the effect that a practice may be unfair even if it is not unlawful, and that claims based on "unfair" practices are not derivative.

In any event, plaintiff's UCL claims are not viable because plaintiff cannot obtain either of the only two remedies permitted under the UCL: restitution and injunctive relief.

The principles on restitution are explained in *Korea Supply, supra,* 29 Cal.4th 1134. "[A]n order for restitution is one 'compelling a UCL defendant to return money obtained through an unfair business practice to those persons in interest from whom the property was taken, that is, to persons who had an ownership interest in the property or those claiming through that person.' [Citation.] The object of restitution is to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest." (*Id.* at p. 1149.) The concept of restitution under the UCL " 'is not limited only to the return of money or property that was once in the possession of that person,' " but instead "is broad enough to allow a plaintiff to recover money or property in which he or she has a vested interest." (*Korea Supply,* at p. 1149; *id.* at pp. 1150–1151 ["a claim for damages . . . is not permitted under the UCL"; " 'Compensation for a lost business opportunity is a measure of damages and not restitution to the alleged victims.' "].)

Plaintiff contends he is entitled to "restitutionary damages" because he had a "vested interest" in certain warrant shares. This

refers to allegations in plaintiff's first cause of action against Banc for breach of contract, not to his allegation of unfair business practices. In his cause of action for breach of contract, plaintiff alleged Banc did not allow plaintiff to convert his warrant shares (Class B common stock) into Class A voting stock, breaching two agreements between plaintiff and Banc, and resulting in damages of not less than $17 million. Plaintiff's complaint did not allege that this breach of contract was an unfair business practice under the UCL.

The complaint alleged that Banc defendants' unfair business practices "were made in order to keep [plaintiff] from competing with the Defendants in the banking business and within private equity and financial services." Plaintiff does not explain how Banc's alleged breach of contract concerning the warrant shares has anything to do with preventing him from competing in the banking business. Plaintiff has neither alleged nor shown entitlement to restitution under the UCL based on the warrant shares.

Plaintiff contends he is entitled to an injunction because "nothing suggests that [defendants] have ceased (or will cease) their disparagement campaign." He says the disparagement continued even after he filed the original complaint, citing the January 2020 letters. Those letters were a response to plaintiff's own demands and warnings of litigation, and are arguably covered by the litigation privilege. In any event, plaintiff has not established a defamation claim and, as *Hawran* tells us, a UCL claim "based on the same assertedly false and defamatory . . . statements [as a defamation claim] stands or falls with that underlying claim." (*Hawran, supra,* 209 Cal.App.4th at p. 277.)

40

Moreover, the UCL "has not altered the nature of injunctive relief, which requires a threat that the misconduct to be enjoined is likely to be repeated in the future." (*Madrid v. Perot Systems Corp.* (2005) 130 Cal.App.4th 440, 465; *id.* at p. 463 ["Injunctive relief is appropriate only when there is a threat of continuing misconduct."].)  Injunctions issue to prevent wrongful acts that are causing irreparable harm; they do not issue based on speculation that defendants might again make defamatory statements.  "[I]n the absence of a threat that an unlawful act will occur in the future" (*id.* at p. 464), injunctive relief is not authorized under the UCL.

**[End of nonpublished portion]**
**DISPOSITION**

The trial court's orders are affirmed to the extent the court granted the Banc defendants' anti-SLAPP motions to strike plaintiff's second, third, fifth, sixth, seventh, eighth and ninth causes of action.  The orders are reversed to the extent the trial court denied the Banc defendants' motions, and the court is directed to grant the motions in their entirety.  All defendants shall recover costs on appeal.

GRIMES, Acting P. J.

WE CONCUR:

STRATTON, J.          HARUTUNIAN, J.[†]

---

[†]      Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

41